**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| PROMIER PRODUCTS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO.: |
| | ) | |
| ORION CAPITAL, LLC, | ) | **JURY DEMAND** |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiff PROMIER PRODUCTS, INC. ("Plaintiff" or "Promier"), by and through its attorneys, submits this complaint for declaratory judgment against Defendant ORION CAPITAL, LLC ("Defendant" or "Orion Capital"), and states as follows:

**NATURE OF THE CASE**

1.      This dispute arises in light of a failed business arrangement between the parties. In April 2020, in the wake of the global COVID-19 pandemic, Promier, traditionally a developer and seller of innovative flashlights, work lights and batteries, opted to use its business relationships with Chinese manufacturers to supply various state agencies across the country with personal protective equipment ("PPE") which was in extreme shortage due to the pandemic. As Promier became better known in the PPE industry, it was approached by Orion Capital.

2.      Promier and Orion Capital entered into an oral agreement by which Orion Capital would work as a sales representative on Promier's behalf, facilitating conversations between Promier and third parties who were interested in purchasing Promier's PPE. With the exception of one unprofitable deal, Orion Capital worked on a commission-basis, earning a small percentage of profits for any sales it was able to facilitate as a sales representative.

1

3.      Orion Capital continued working as a sales representative on Promier's behalf for several months, without incident. During this time period, Orion Capital contributed only a pittance to the millions of dollars of PPE that Promier purchased and sold to customers, was not responsible for importing materials, had no risk in the enterprise, and did not direct the enterprise. Orion Capital's primary responsibility was to find potential customers and, occasionally, help service or collect payment from such customers after PPE was supplied by Promier.

4.      This dispute arose when Promier offered to pay Orion Capital a significant amount of money for its work, but Orion Capital insisted it deserved half of all profits made on PPE sales as a "joint venture" with Promier.

5.      Orion Capital is currently threatening to sue Promier for $6 million under a joint venture or partnership theory.  Against this backdrop, Promier seeks a declaration from the Court that Orion Capital was not a joint venture or a partner in Promier's sales of PPE—but was nothing more than a sales representative entitled to a commission on sales it brokered.

## PARTIES

6.      Promier is a corporation organized under the laws of Illinois with its headquarters and principal place of business in Peru, Illinois. Promier exports hard goods throughout various industries, under various household brands from China into the United States. These goods include flashlights, work lights, batteries, and PPE.

7.      Upon information and belief, Orion Capital is a limited liability company organized under the laws of Virginia with its headquarters and principal place of business in Martinsville, Virginia. Orion Capital is a private equity firm.

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a) because complete diversity exists between the parties and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, (viewing Defendant's threatened claim of $6 million as an affirmative controversy).

9.     This Court has jurisdiction over Orion Capital and this matter pursuant to, *inter alia*, 735 ILCS 5/2-209(a)(1) & (7), because Orion Capital knowingly and intentionally sought out, entered into an agreement with, and did business—namely the PPE business at issue in this litigation—with a citizen of this State for the express purpose of taking advantage of business connections between that citizen and the State of Illinois.

10.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because of the substantial connections of this case to the Northern District of Illinois, including, *inter alia*, Promier is a resident of this district, the harm suffered if a declaratory judgment is not granted will be directed towards residents of this district, and Orion Capital is subject to jurisdiction in this district.

## FACTUAL ALLEGATIONS

11.     For over 10 years, Promier has been designing, developing, importing and selling a wide variety of goods throughout various industries and under various household brands, including products such as flashlights, work lights and batteries.

12.     Promier imports many of these products from China and maintains offices throughout China. Promier's products at times are found in as many as 100,000 retail stores across the United States.

13.     In March of 2020, as the COVID-19 pandemic exploded in the United States and health care facilities were in desperate need of supplies, Promier pivoted its business to help solve the demand for PPE products.  For example, Promier began supplying a wide variety of customers with PPE products, including the State of Illinois Governor's Office and the Illinois Emergency Management Agency.

14.     In 2020, a third-party businessman who was purchasing PPE from Promier introduced Promier to Mr. Richard Hall ("Hall"), purportedly the Managing Director of Orion Capital. Orion Capital is a small private equity firm, managed and directed by Hall.

15.     Hall proposed to Promier that he could use his business connections at Orion Capital to introduce Promier to a variety of customers interested in purchasing PPE.

16.     It was particularly important to Hall that Promier had an established track record of doing business with state government agencies in Illinois, as Hall knew these connections would establish Promier's credibility with other government agencies or large organizations.

17.     To this end, on April 14, 2020, while the parties were establishing their relationship, Matt Pell of Promier wrote to Richard Hall and Scott Weiland (also with Orion Capital, on information and belief) to explain Promier's business—including its recent, significant, PPE transactions with the State of Illinois:

> Hi Richard and Scott,
>
> It was a pleasure speaking with you both just now. Please see attached and below info providing just a bit of information about our company, Promier Products, Inc. and also how we can service your needs, whatever those needs may be. We have been exporting products out of China for 10 years, and we are also working with the State of Illinois Governor's Office and IEMA to supply PPE products. We are currently shipping out about 200k-500k units of products every day from our factories.

18. From this same e-mail, it is plain that Orion Capital was seeking to do business with Promier, where Pell agreed to provide price quotes for specific PPE that Orion Capital was trying to sell to Duke University. Pell stated:

> I will work tonight to get quotes together on the following: Shoe Covers (500k pair MOQ), Nitrile Gloves (200k pair MOQ), Bouffant Caps (250k MOQ)

19. From this same e-mail, Pell also explained how to submit a purchase order and agreed to get quotes for specific PPE that Orion Capital was trying to sell to Duke University. Pell stated:

> Submitting a Purchase Order to Promier Products, Inc:
>
> Please submit a formal Purchase Order according to the instructions below. Here's what we need included on a Purchase Order:
>
> 1) Items Ordered & Quantities of Each Item Ordered
>
> 2) Shipping Terms: Promier will arrange and pay for the logistics (unless otherwise noted)
>
> 3) Payment Terms: Generally 50% Deposit to start Production or reserve stock; 50% Due once Goods are Ready to Ship; some items may vary
>
> 4) Payment Methods: Wire Transfer (Wire Instructions Attached)
>
> 5) Ordering From:
>
> Promier Products, Inc
>
> 350 5th Street, Suite 266
>
> Peru, IL 61354
>
> FDA Owner/Operator Number: xxxxxxxx
>
> FEIN Number: xxxxxxxx (Promier Products, Inc.)
>
> 6) Customer Business Name, Address, Phone Number, Email, and Accts Payable Contact
>
> 7) Date of Purchase Order

8) Customer Signature on Purchase Order

9) Note must be included on Purchase Order that says "Non-Cancelling"

**Orion Capital's Richard Hall Acts As A Sales Representative**

20.     The parties agreed orally that Hall could begin making introductions—but reached no immediate agreement as to the capacity in which Hall or Orion Capital would act for or with Promier.  At this juncture, neither Hall nor Orion Capital made any kind of monetary investment into Promier.  Tellingly, Promier did not look to Hall or Orion Capital to organize its PPE business, assist it in obtaining PPE supply relationships, or any other facet of the business.

21.     In his role as a sales representative of Promier, Hall engaged in e-mail exchanges such as the following, on April 4-5, 2020, with government officials in the Commonwealth of Virginia responsible for acquiring protective masks:

---------- Forwarded message ---------
From: **Richard Hall** <rh@orioncapllc.com>
Date: Sun, Apr 5, 2020 at 3:05 PM
Subject: Fwd: KN95 Masks from China
To: Joseph Damico <joe.damico@dgs.virginia.gov>
Cc: Robby Demeria <robby.demeria@governor.virginia.gov>

Joe,

I hope you are doing well in all this chaos. Believe it or not we have 10 cases in Franklin County.

I reached out to Commerce on Friday to offer help if I could. I learned from the emails below that DGS is in charge of supply chain and wanted to offer to help.  As of Friday my contacts have access to up to 15M KN95 masks monthly. I ordered a box of 500 and received them on Saturday to verify. My contact just sold 2M to the state of Illinois last week and had them shipped in via air freight. He is an importer and has boots on the ground in China which is critical **and the only way to truly guarantee delivery.**

Monday will be a very fluid day and if you're interested give me a call to get in front of that noise.

Thanks,

**Richard Hall**

**Orion Capital**
**276-226-0456**
rh@orioncapllc.com

6

On Sat, Apr 4, 2020 at 4:24 PM Demeria, Robby <robby.demeria@governor.virginia.gov> wrote:
Shawn -

Richard Hall is a CIT board member and in a previous life had a tremendous number of contacts in the import world. His contact in China has the ability to procure up to 15 million KN95 masks. Illinois just procured 2 million from this contact.

Richard had about 500 shipped to him in Martinsville. I know you were sorting through the procurement contractor this week and so I'm not sure if they're ready to start talking to folks like Richard. He's the real deal and is looking out for Virginia.

Feel free to bump me to someone else if easier. Just want to make sure our folks are aware of this opportunity.

Robby

--

**Robby Demeria**
**Deputy Secretary of Commerce & Trade for Technology**
Patrick Henry Building | 1111 East Broad Street, Richmond
804.225.4316 (o) | robby.demeria@governor.virginia.gov
--

Shawn G. Talmadge, CEM
Assistant Secretary of Public Safety and Homeland Security
Commonwealth of Virginia
1111 E. Broad St
Richmond, VA 23219
(804) 371-2602

22.    In his email, Hall was providing introductions of "[h]is contact"—*i.e.*, Promier— with "the ability to procure up to 15 million KN95 masks." There is no evidence pertaining to this deal to support the notion that the parties were "partners" or in a "joint venture." Furthermore, Hall was utilizing Promier's success with the State of Illinois ("Illinois just procured 2 million [masks] from this contact") in order to solicit business with the Commonwealth of Virginia. Neither Hall nor Orion Capital played any role in this sale of 2 million masks by Promier to the State of Illinois.

23.    On April 9, 2020, Hall ghost wrote an e-mail for Cody Grandadam, Promier's President, to send to the Commonwealth of Virginia. In that e-mail, Hall again described himself as Promier's "introducing agent," and explained that Promier is the "actual importer" and "selling entity" of PPE. Hall's e-mail is provided below.

---------- Forwarded message ---------
From: **Richard Hall** <rh@orioncapllc.com>
Date: Thu, Apr 9, 2020 at 11:39 AM
Subject: Re: Reference for Orion Capital LLC
To: Cody Grandadam <cody.grandadam@litezall.com>

CODY, - Please see this as response and give me your thoughts...

I apologize for any delay in responding and any confusion. Orion Capital and Richard are acting as introducing agents for my company Premier Products. I am the actual importer and selling entity of the KN95 masks. As I previously stated, my main business is a Lighting Company, and my manufacturing is in China. I have pivoted my business, given my relationship with mask manufactures and my workforce on the ground in China to provide a source of KN95 and N95 mask. I cannot emphasize enough the importance of having boots on the ground in China to guarantee the execution of the orders and delivery.

I am attaching the questionnaire that I previously supplied to Richard and DGS and would be more than happy to speak with you directly if that would be easier.

24.     On April 16, 2020, Pell sent the e-mail excerpted below to Rhonda Barnett at Orlando Health, a potential customer, copied Hall, and explained that: "Richard Hall (Orion Capital) is operating as a Sales Representative for our company, Promier Products, Inc., simply providing assistance and facilitating communication between myself (Promier) and potential partners."

From: **Matt Pell** <matt.pell@accubow.com>
Date: Thu, Apr 16, 2020 at 5:10 PM
Subject: Re: N95 Specs
To: Barnett, Rhonda K. <Rhonda.Barnett@orlandohealth.com>
Cc: Richard Hall <rh@orioncapllc.com>

Richard Hall (Orion Capital) is operating as a Sales Representative for our company, Promier Products, Inc., simply providing assistance and facilitating communication between myself (Promier) and potential partners. Richard has vast experience with Private Equity and Governmental relations and has been a great help in providing fast communication, while also providing necessary documents about our company with the current volume of inquiries we are receiving.

Richard is also good friends with David Strong, as their sons played soccer together at Hampden Sydney. This is also how this initial relationship and conversation started with Orlando Health.

Please find attached W-9.

25.     Neither Hall nor Orion Capital objected to Pell's description of "Richard Hall (Orion Capital) as operating as a Sales Representative for" Promier to Ms. Barnett at Orlando Health.

26.     Similarly, with respect to PPE sold to the State of Texas—specifically to the Texas Department of Emergency Management ("TDEM")—Orion Capital acted plainly as nothing more than a sales representative.

27.     To begin with, Promier's Matt Pell provided the very contact from TDEM to Orion Capital.  He suggested that Orion Capital call a specific individual at TDEM and he provided a packet of information about the PPE Promier could provide to TDEM for Orion Capital to share.

28.     Indeed, when Orion Capital communicated with TDEM (before Promier found the name of a specific individual to which Orion Capital should direct its communications), it did nothing more than introduce TDEM to Promier, whom Orion Capital "represent[ed].":

Hello Texas Division Emergency Management,

I understand you are seeking a Supplier of PPE Items who can deliver?! Specifically, N95, KN95, 3-Ply, Face Shield and Goggles.

Look no further as Promier Products is your Supplier!!!

By way of virtual introduction my name is Scott Weiland and I represent Promier Products.  I have copied Matt Pell, CEO of Promier Products and Richard Hall, Managing Director or Orion Capital, LLC on this email.

29.     Mr. Weiland's representation of Orion Capital's role—"I represent Promier Products"—is in keeping with how Promier explained who Orion Capital was in relation to the TDEM transaction: a "Sales Representatives for us and aiding in client communication."

---------- Forwarded message ---------
From: **Matt Pell** <matt.pell@accubow.com>
Date: Thu, May 14, 2020 at 10:13 PM
Subject: Re: TDEM Payment Terms - Promier Products
To: Tim Turczyn <timturczyn@gmail.com>
Cc: Cody Grandadam <cody.grandadam@litezall.com>

They are acting as Sales Representatives for us and aiding in client communication.

On Thu, May 14, 2020 at 9:43 PM Tim Turczyn <timturczyn@gmail.com> wrote:

> ---------- Forwarded message ---------
> From: **Amanda Anderson** <Amanda.Anderson@firstmidwest.com>
> Date: Thu, May 14, 2020, 5:30 PM
> Subject: RE: TDEM Payment Terms - Promier Products
> To: Tim Turczyn <timturczyn@gmail.com>
>
>
> Tim,
>
>
> Who is Orion Capital?
>
>
> **Amanda Anderson**
> Assistant Vice President Commercial Banking
> 815.941.3756 phone
> 815.941.3777 fax
> amanda.anderson@firstmidwest.com

30.     The relationship between Promier and its sales representative, Orion Capital, did not change with time.  In fact, on May 23, 2020, Hall wrote, in an e-mail excerpted below, to a Promier client: "Again, I like you; ***I am merely an arm's length advisor on this situation with no skin in the game*** other than to say Promier is a trustworthy business with real employees and actual customers."  (*emphasis added*).

**From:** Richard Hall <rh@orioncapllc.com>
**Subject: Fwd: Regarding Gloves**
**Date:** May 23, 2020 at 12:05:16 PM EDT
**To:** Charvin@sanitaint.com
**Cc:** cmharvin@gamil.com

Chris,

Thanks for the chat yesterday. I wanted to follow-up with items below that I feel served no purpose in solving the situation you and I were trying to solve, in fact, if true only makes the situation worse.

As I stated, Joshua and Premier got on another recorded zoom call after our initial call. What transpired was another juvenile emotional outburst in which Joshua was cursing and hung up in the middle of the call regarding some gloves. I just wanted to provide you with some of the back up we discussed.

I'm sure Joshua let his emotions get the best of him, and unfortunately, doing so likely made things more difficult. It is my hope Joshua's attempted tortuous interference in Premier's business in Texas was his emotionally venting and didn't actually occur. There were other emails between the parties that Joshua should share with you so that you are in the loop.

Again, I like you; I am merely an arm's length advisor on this situation with no skin in the game other than to say Premier is a trustworthy business with real employees and actual customers. They are not in the business of buying a product and flipping it within hours for a quick profit. That, in a nutshell, is the problem with this PPE situation for suppliers and vendors alike.

Hopefully, they can get past all and move forward. I look forward to meeting you next week, and we would welcome the opportunity to do business directly with you and only with you going forward. I am particularly interested in discussing some of work in you do in the IC to see if there is overlap with my Dark Web clients.

Best Regards,

**Richard Hall**

## Premier Provides 97 Percent Of The Financing, At Significant Risk, For The PPE Business

31.     Between April 2020 and January 2021, Premier sold $27.9 million in PPE to two primary customers it met in connection with Orion Capital—Duke University and the State of Texas—and a handful of much smaller volume customers.  Because the Duke University and State of Texas transactions accounted for the largest deals that Orion Capital was able to broker on behalf of Premier (sales to the remaining customers amounted to only $115,000 in revenue), the Complaint references them exclusively.

32.     Premier's direct cost of the PPE products sold to Duke University and the State of Texas (*i.e.,* purchase price paid to the factory, tariffs, shipping expenses, and taxes) was approximately $16 million.  Premier fronted the vast majority of the purchase price for these PPE products. Indeed, Premier borrowed millions of dollars and leveraged its assets in order to obtain PPE to meet customer demands, including but not limited to the PPE demands of Duke University and the State of Texas.

33.     Incidental costs related to the PPE products sold to Duke University and the State of Texas was another $1.3 million.  Premier covered all of the incidental costs relating to these transactions, including but not limited to warehouse facilities, insurance, and employee salaries.

34.     With limited exception, Orion Capital did not contribute to these direct costs or incidental costs. In fact, on May 15, 2020, Premier sought Orion Capital's help in obtaining a $5 million loan in connection with PPE products needed to fill orders from the Texas Department of Emergency Management ("TDEM").  Neither Hall nor Orion Capital assisted in raising these funds in any way.

35.      Instead, between May 29 and June 8, 2020, Premier borrowed $2,000,000 from a private source that required repayment and imposed 10 percent interest on the loan.  In addition, Premier had to pledge its corporate office building (with a monthly rent roll in excess of $35,000) as collateral for this loan.  Previously, the building had been completely unencumbered.

36.     In addition, by May 29, 2020, Premier had completely used a $4.5 million line of credit that it had with its primary bank, First Midwest Bank.  This line, which Premier used to fund the purchase of PPE, was personally guaranteed by Cody Grandadam, Premier's President, and two of his other business partners—Tim and Michael Turczyn.

37.     Similarly, on June 24, 2020, in a conversation in which Orion Capital was trying to determine why a specific shipment of PPE from China was delayed, Premier notified Hall that the delay was attributable to Premier owing two million dollars for PPE products from China, for which it did not then have the funds to pay.  As the text excerpt below shows, Hall did not offer to front the necessary funds or put himself at risk, the way Premier had done.  Instead, Hall simply replied, "F***."



38.     Ultimately, the only capital contribution that Orion Capital made consisted of $345,000 in loans that it fronted for the purchase of PPE sold to Duke University in three transactions totaling $623,920.  Promier repaid these loans in full in a manner of weeks.

39.     When considering Orion Capital's $345,000 in loans and the $17.3 million in total expenses, Promier provided 97 percent and Orion Capital provided merely 3 percent of the expenses.  Put differently, Orion Capital loaned money to fund 2 percent of all of the PPE products that Promier sold to customers introduced to it by Orion Capital.  These *de minimis* percentages hardly resemble a joint venture—nor should any agreement as to how to compensate Orion Capital for the transactions including its loans apply to the entire venture.[1]

---

[1]  On April 15, 2020, in an e-mail related to one of these transactions, Promier's Matt Pell provided Orion Capital with the prices it had to receive for the PPE products it was providing to customers, but also stated that, "As Cody has explained, you guys are free to markup above these prices, and we will split whatever the markup may be, but at minimum, those are the prices that our company must charge to the customer." Again, an agreement to split a markup Orion Capital may or may not have obtained above Promier's proposed prices on 2 percent of the total transactions is hardly an indicator of the parties' overall compensation arrangement.

13

**Promier Controlled The PPE Business**

40.     Not only did Promier bear virtually all of the risk and provide 97 percent of the capital for these $27.9 million in sales, but Promier also controlled the PPE business.

41.     Orion Capital's role was limited to finding customers, facilitating communication with Promier, occasionally advising customers of order status, occasionally collecting money from customers, and taking information Promier provided it in order to register Promier—not a separate joint venture, but Promier—to sell PPE in other states.

42.     On the other hand, Promier's staff took customer orders, procured pricing for products, compiled pricing and bids, financed orders, oversaw product importation, and managed customer invoicing and payment.  In these transactions, Orion Capital acted only as a middle-man, ferrying approved information from customers and funneling back information and data from Promier to the customers.

43.     A May 9, 2020 email from Promier's Pell to Orion Capital's Weiland forwarded information and instructions for Weiland on to best respond to TDEM. This email, excerpted below, emphasized that Promier was in complete control of the parties' business and directed how exactly how Orion Capital would represent it.

From: **Matt Pell** <matt.pell@accubow.com>
Date: Sat, May 9, 2020 at 10:50 AM
Subject: Fwd: FW: KN95 Respirators FDA Info
To: scott.weiland <scott.weiland@orioncapllc.com>
Cc: Richard Hall <rh@orioncapllc.com>

Scott - see below response to send Texas regarding a complete explanation of Appendix A and how it relates to our products.

---------- Forwarded message ----------

We have the following that are still listed with the FDA with proper registration numbers and classifications, as listed on the FDA site directly. Appendix A was ONLY the temporary listing under the EUA (Emergency Use Authorization) to allow those products and companies **NOT already listed with FDA** to be allowed through.

The KN95s that we have in current inventory are still registered with FDA, with active links on the FDA site, as follows:

1.  **Anshan Health and Medical Technology Co (Weining):** https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRL/rl.cfm?lid=654109&lpcd=MSH
2.  **Quanzhou Forwin:** https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRL/rl.cfm?lid=660735&lpcd=QKR
3.  **Huiwap:** https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRL/rl.cfm?lid=6761174&lpcd=QKR
4.  **Wenzhou Haochuo:** https://www.accessdata.fda.gov/scripts/cdrh/cfdocs/cfRL/rl.cfm?lid=674318&lpcd=MSH

We have approximately 1.05M left in stock, so please let me know what allocation and price point you are authorized to make a purchase for.

14

44. Furthermore, for each transaction, Promier—through its extensive resources in China—procured PPE products, which comprised overseeing the production, packaging, importation, warehousing and shipment of the PPE products.

45. Over time, Promier even communicated updates to Duke University regarding product shipments and factory-related quality controls, as demonstrated in the following e-mail from Promier's Matt Pell to Duke University's William Trofi in November, 2020:

From: Matt Pell <matt.pell@accubow.com>
Sent: Thursday, November 5, 2020 3:04 PM
To: William Trofi <bill.trofi@duke.edu>
Subject: Re: Glove Update

Hey Bill!

We have a little over a million at the airport getting inspected by SGS right now. We just picked up another million yesterday from the factory and will need to get those SGS inspected as well. We have a meeting at the factory today to plan out the remaining gloves and I will update you on that tomorrow.

Some notes: in the last week we've been implementing new factory controls to improve quality at the factory. It is going to slow down the process a little but per our conversations, that is okay. We've also been working with SGS to go over their inspection procedures and get their inspectors scheduled.

Stay tuned for another update tomorrow!

Thanks Bill,

On Thu, Nov 5, 2020 at 1:31 PM William Trofi <bill.trofi@duke.edu> wrote:

> Hi Matt,
>
> Will you please send me an update on the remaining glove delivery to Duke.
>
> Thanks

46. Typically, Promier would oversee the process of packing PPE products in quantities needed to meet customer expectations in China. In addition, Promier would have PPE products shipped to its warehouse facility in Peru, Illinois, where its staff was responsible for unloading and staging the products for domestic shipment to customers.

47. Occasionally, Promier would have PPE products shipped to a third-party transshipment facility, where Promier would contract to have the goods repackaged (if needed) and shipped to the customer's final destinations.

48. Promier handled the logistics of eighty-four (84) air and ocean shipments of PPE products during the course of the parties' dealings.

15

49.     On one occasion, Hall volunteered to oversee the sorting and repackaging effort of thirteen (13) air shipments of PPE products that had been consolidated in a transshipment facility in Texas. All the services performed while in Texas involved standard practices for consolidating multiple shipments into a single order, including repackaging the products, placing appropriate labels and stickers on the products, shrink-wrapping the products, and palletizing them.

50.     Orion Capital's oversight of the consolidation of thirteen (13) air shipments into one order for the State of Texas—reflecting 13.4 percent of the total shipments in the parties' business relationship—does not support Orion Capital's claim that it exercised meaningful control over the parties' business dealings.

51.     Indeed, most tellingly, Promier decided to which customers it would sell PPE, at what prices, and on what terms.  No one at Orion Capital ever had authority to enter into any sort of agreement regarding Promier's sale of PPE products absent Promier's approval.

52.     In addition, Orion Capital played only a nominal role in getting Promier registered to sell PPE in various states.  Promier was registered to sell PPE in the State of Illinois before Orion Capital solicited Promier's business in April 2020.

53.     Orion Capital took information compiled by Promier and helped Promier get registered in other states—most notably North Carolina and Texas.  But, this effort does not indicate any kind of "joint control over the PPE business" for at least three reasons. First, Orion Capital did not register some form of joint venture to sell PPE; instead, it registered Promier, an existing entity with considerable experience selling and supplying PPE to customers.  Next, Promier had to do the work to compile information needed for PPE applications; Orion Capital simply filed the information.  And, finally, the act of filing an application with Promier's

permission and Premier's information is more in keeping with being an agent or a clerk; it is not the kind of high-level management activity that demonstrates "joint control" over a business.

**Orion Capital and Premier Separately Engage In PPE Business**

54.     Prior to Hall and Orion Capital agreeing to act a sales representative of Premier, Premier was selling PPE products to various customers.

55.     Even after Orion Capital and Premier began working together, Premier continued to conduct its own business selling PPE products directly to customers, separate and apart from Orion Capital.

56.     Premier had no need to enter into a joint venture relationship with Orion Capital to sell PPE products to customers.

57.     Orion Capital also continued to sell PPE products, namely bouffant caps, gloves, and shoe covers, separate and apart from its relationship with Premier.

58.     At no point were Orion Capital and Premier in an exclusive selling relationship for PPE products.

59.     Orion Capital was not the first nor the only sales representative that Premier employed to assist in sales transactions. Premier employs other agents to act as sales representatives to sell its products, operating on a commission sales basis with them.

**Orion Capital Demands An Even Split Of All Profits**

60.     In January of 2021, the parties' relationship went sideways.

61.     Perhaps buoyed by the success enjoyed from the risks Premier had taken, Orion Capital contended—***for the very first time in the parties' relationship***—that it was in a joint venture with Premier.   Based upon its joint venture contention, Orion Capital demanded that Premier pay it $6 million for its "efforts" since March of 2020.

17

62.     Orion Capital's demand—which it recently "discounted" to $5.5 million—is completely out of proportion with the role it played in the relevant transactions.  Orion Capital did not finance 97-98 percent of the entire expense of these transactions.  Orion Capital did not take on the risk from these transactions, where Promier and its principals took personal and business risk to raise the funds needed to finance these transactions.  Orion Capital did not direct the business, either, acting as a mere middleman.

63.     Despite the parties' attempts to resolve this dispute, Orion Capital has continued to tout itself as being in a joint venturer, aggressively demanding that Promier pay $5.5 million for Orion Capital's "efforts."  Neither Hall nor Orion Capital is entitled to a financial windfall from Promier.

<u>**COUNT I**</u>

<u>**Declaratory Judgment**</u>

64.     Promier incorporates and re-alleges the factual allegations set forth in the other paragraphs of this Complaint as if fully set forth herein.

65.     Promier contends that it is not currently, nor has it ever entered into a joint venture agreement of any kind with Orion Capital and the extent to which Orion Capital alleges otherwise is both legally and factually flawed. Under Illinois law, there are five key elements that must be met in order to prove a joint venture or partnership exists:  "(1) an express or implied agreement to carry on a joint enterprise, (2) a manifestation of that intent by the parties, (3) a joint propriety interest, as demonstrated by the contribution of property, finances, effort, skill or knowledge by each party to the joint venture, (4) some degree of joint control over the enterprise, <u>and</u> (5) a provision for the parties to share in both the profits and losses of the enterprise." *Yokel v. Hite,* 348 Ill. App. 3d 703, 709 (2004).

66.     *First*, Orion Capital is unable to show a scintilla of evidence that the parties had the requisite meeting of the minds necessary to create a joint venture. Orion Capital cannot produce any document or identify any conversation that expressly showcases an intent, understood by both parties, to carry on as joint-venturers.

67.     The small Duke University transactions that Orion Capital claims evinces such an intent are separate transactions in which the parties agreed to split the markup above the minimum price Premier needed to receive to cover its product costs.  In other words, once Premier was made whole, the parties agreed to split some incremental, additional, profit.  This does not evidence a joint venture, in which parties would be expected to split all profits and expenses 50/50.

68.     *Second*, as is well-established above, the conduct displayed by *both* parties to third parties demonstrates that the only relationship the parties intended to form was that of a principal and agent. As stated above, Orion Capital's *own words* show that it was only ever acting at the direction of Premier both "with no skin in the game" and operating at "arms-length."

69.     *Third*, the parties did not jointly share the risks of the PPE business.  Instead, Premier financed 97 percent of the transactions, at great risk to itself and its founders, who were on the hook for millions of dollars in loans.  Orion Capital provided 3 percent of the expenses for three small transactions with Duke University.  This nominal risk does not support a finding that Orion Capital and Premier were engaged in a joint venture to sell $27.9 million in PPE products.

70.     *Fourth*, Orion Capital had no say in the direction of Premier's PPE business for which it hounded Premier to be involved with in the first place. Premier has always been the sole decision-maker and had full discretion over all aspects of the business. Orion Capital was never consulted for determinative input on any decisions related to the business as all parties knew the business belonged to Premier. Orion Capital required Premier's express authorization before

19

moving forward with any plans in the business. Orion Capital's assistance in repackaging one order (made up of 13 shipments out of nearly 100 total shipments) does not evince "control" over the business, nor does Orion Capital's ministerial work in filing applications with information and approval provided by Promier.

71.     ***Fifth***, as there is no document that Orion Capital can offer that encapsulates an intent to create a joint venture between the parties, there is likewise no provision it can point to that stipulates the parties agree to split profits. Again, as discussed above, the Duke University arrangements do not involve splitting profits and losses—they involve Promier allowing Orion Capital to share some incremental profits after Promier is made whole on PPE products ordered and imported by Promier.

72.     By reason of the foregoing, an actual and justiciable controversy exists between the parties and each of them, which may be determined by a judgment of this Honorable Court. Pursuant to 28 U.S.C. §§ 2201 and 2202, this Honorable Court has the power to declare and adjudicate the rights and liabilities of the parties hereto under the terms and provisions of the parties' relationship referred to herein and to adjudicate the final right of all parties and to give such other and further relief as may be necessary to enforce same.

WHEREFORE, Promier respectfully requests the court to enter a judgment:

(a)     declaring that the parties have not entered into a joint venture together;

(b)     awarding Plaintiff its reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b); and

(c)     granting such other and further relief as the Court may deem equitable and just.

Dated: February 24, 2021

Respectfully submitted,

    s/ *Vincent P. (Trace) Schmeltz III*
Vincent P. (Trace) Schmeltz III
Megan Krivoshey
**BARNES & THORNBURG LLP**
One N. Wacker Drive, Suite 4400
Chicago, Illinois 60606
Telephone: 312-214-5602
Fax: 312-759-5646
tschmeltz@btlaw.com
mkrivoshey@btlaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2021, I electronically filed the foregoing Complaint for Declaratory Judgment with the Clerk of the Court using the Court's CM/ECF service, which will send notice to all counsel of record listed below.


William M. Stanley
THE STANLEY LAW GROUP
13508 Booker T. Washington Highway
Moneta, VA 24121
bstanley@vastanleylawgrou.com


         s/ *Vincent P. (Trace) Schmeltz III*
         Vincent P. (Trace) Schmeltz III